Hon. C. Voorhies,
Hon. A. M. Buchanan,
Hon. A. N. Ogden,
Hon. J. G. Campbell.

} *Associate Justices.*

---

### Almira Gates *v.* John Walker.

*Caldwell* was appointed curator of the succession of *Gates.* He filed a tableau which was opposed by *Marks*, through *T. A. Bartlette*, attorney at law, *Marks* claiming to be a creditor as vendor of goods to one *Johnson*, for whom *Gates* became surety, as *Marks* alleged. The evidence was altogether parole. *Marks'* claim was rejected, but by consent of counsel a judgment of non-suit was entered. Subsequently, *Caldwell* absconded, and *Walker* applied for the curatorship, through *Bartlette*, was appointed, and obtained judgment against *Leefe, Caldwell's* surety. Execution issued against *Leefe*, and the return showed that before sale of the property seized, the case "was settled by the parties." During the summer vacation, *Walker* filed a tableau recognizing *Marks'* claim, which, not being opposed, was allowed; but the judgment of homologation was never signed. *Almira Gates*, the widow of *Gates*, sued to set aside the homologation, charging collusion between *Marks* and the curator, *Walker*. *By the Court*, the recognition of *Marks'* claim by the curator was collusive. *Walker* obtained the curatorship for the sole purpose of obliging *Marks*, and of enabling him to make his claim. It was an abuse of the forms of legal proceedings for the curator, under the circumstances, to place upon the tableau a claim which had been rejected, after trial before the Court.

Where the return of an execution against the surety of a defaulting curator shows that the case was "settled by the parties," the creditors, in the absense of further explanation, have a right to consider the amount of the execution as having been paid in cash.

The wife of the deceased, though she had lived apart from him, was not judicially separated from bed and board, and she had an interest in his estate, at least for the purpose of presenting her claim for the marital portion for adjudication.

It seems that a Judge, in whose Court the *mortuaria* are pending, may *proprio motu* entertain an inquiry into an abuse of the form of legal proceedings in his own Court, such as this case presents.

APPEAL from the Second District Court of New Orleans. *Lea*, J. *Spring*, for plaintiff. *Bartlette*, for defendant and appellant.

Slidell, C. J. *Spencer Gates*, whose occupation was that of a deputy sheriff in New Orleans, died here in January, 1849. *John S. Caldwell* was appointed his curator. The total estate left by the deceased amounted to $1965. In 1850

*Caldwell* filed a tableau of distribution, and *E. J. Marks* made opposition, claiming to be a creditor in the sum of $768 50. This amount was alleged to be due by the deceased, as surety of one *Johnson*, for a purchase of merchandize made by *Johnson* from *Marks*, on the 15th December, 1848. In this matter, *T. A. Bartlette. Esq.*, acted as the attorney of *Marks*. After a trial in the usual course, the Court rejected the claim of *Marks*, but before the judgment was signed, it was, by consent of counsel, amended so as to be a judgment of non-suit only, reserving to *Marks* leave to exercise his rights, if any he had, by sub-sequent proceedings. The District Judge gave at length his reasons for the rejection of the claim; and as they have a material bearing upon subsequent matters, out of which the present controversy has grown, it is proper to quote his remarks on that occasion :

"The testimony," says the District Judge, "in regard to this claim is very unsatisfactory. It is supported entirely by parole proof, under circumstances which render it improbable, that if the claim were correct, no better evidence could have been offered; there is no detailed account offered, and no proof of any specific sum due. It is hardly probable that a person who was unwilling to credit the purchaser of his goods, should be willing to sell at a year's credit, upon the security of a mere stranger, without taking a note, or some written evidence of the debt; and it is so easy a matter after one's decease to procure evidence to prove admission, alleged to have been made by him before his death, which, from the fact that they are mere verbal admissions, it is impossible to contradict, that testimony of this kind should be received with great caution. I do not feel satisfied that opponent has a good claim against the succession of *Gates*. It appears, according to the testimony of the principal witness, that *Marks* tried to get a written acknowledgment from *Gates*, but could not get it. If, indeed, the claim be a good one, it is opponent's own fault that there exists no better evidence of it, or that none has been offered. I do not mean to lay it down as a rule, that parole evidence may not sustain even large claims against the estates of deceased persons; but under such circumstances, to be entitled to any weight, it should be definite, positive and supported by circumstances giving it probability, both as respects the relation of the parties and the opportunities of information within reach of the witnesses. The claim is, therefore, rejected."

Subsequently, *Caldwell*, the curator, absconded and died; and *John Walker*, by his attorney, *T. A. Bartlette*, applied for letters of curatorship. After due proceedings, he received them in February, 1851. He then brought suit against *Leefe*, the official surety of *Caldwell*, and recovered judgment for $909 40, and interest, the amount of funds of the estate of *Gates* for which *Caldwell* was a defaulter. By the return of an execution issued against *Leefe* for the amount of the judgment, it appears that on the 29th July, 1851, after a seizure of pro-perty had been made, and before the day of sale arrived, the case was "settled between the parties," an expression which, unexplained, the creditors and heirs of the succession have a right to treat as evidence that the curator, *Walker*, had collected in cash the amount of the judgment. On the 31st July, 1851, the period of the usual summer vacation, when little business is done in the Courts, *Walker* filed a tableau of distribution, in which he states the amount of claims against the estate, which he proposes to pay, and includes among them the claim of *E. J. Marks* for $768 50, and interest from 1st January, 1850. No creditor appeared to oppose, except the Clerk of the Court, who claimed a privilege for a small amount of fees. On the 8th August, 1851, a judgment was rendered, which, after reciting that due publications had been made, sustained

the opposition of the Clerk, and homologated the tableau so amended. This judgment, however, remained unsigned; and in December, 1851, *Almira Gates*, the wife of the deceased, instituted a proceeding before the same Court to set aside the decree of homologation, on the ground of fraudulent collusion between the curator and *Marks*. There was judgment setting aside the decree, and reforming the tableau by striking from it the item of $768 50, allowed to *Marks*, and reducing the fee of *Mr. Bartlette* to $70.

An examination of the evidence constrains us to adopt the conclusion which which forced itself upon the mind of the District Judge. We consider the recognition of *Marks'* claim collusive, and concur fully in the reasons assigned by the District Judge, who remarked as follows:

" This case is presented upon the issue made to the suit instituted herein, for a nullity of the judgment of homologation of the account of *John Walker*, curator, filed on the 23d June, 1851. The material allegations of the petition, so far as relates to the legal merits of the case, are substantially proved. The claim of *Marks* for $768 50 had been fairly presented, on evidence which was unsatisfactory, and rejected. This was well known to *Marks'* counsel, who acted, also, as *Walker's* counsel. In fact, it appears that *Walker* obtained the curatorship for the sole purpose of obliging *Marks*, and of enabling him to make his claim out of the estate. It was an abuse of the forms of legal proceedings for the curator, under the circumstances, to place upon the tableau a claim which had been rejected after trial before the Court, and it appears from the tableau that *Marks'* claim is the only debt placed on the tableau which is not incident to the new administration. Viewing the matter in this light, I declined to sign the judgment · of homologation, when made acquainted with the facts. On the trial of the case, new evidence in support of *Marks'* claim was introduced, and the trial was proceeded in, as if upon an opposition to the tableau. The matter may be considered, therefore, as open for an adjudication upon the merits of the whole case, and have nothing to add to the reasons given on the first trial of *Marks'* claim, except to say that I am not satisfied that *Gates* ever became surety for the debt which is now sought to be collected from his estate."

It is said there is no evidence in the record that the plaintiff in these proceedings has any interest in the succession of *Spencer Gates*.

We consider it satisfactorily proved that *Almira* was the lawful wife of the deceased. Whether she is entitled, as widow in community, not having cohabited with him for many years, and having lived in the North, it is immaterial now to inquire. They, it would seem, never had any children; he died intestate, and it does not appear that he left any ascendants, or collateral relations. If he did not, she would inherit from him, not having been separated from bed and board from him. C. C., Art. 918. There was in this case an estrangement from some cause unexplained, and an actual living apart; but we understand the separation from bed and board (*separation de corps et de biens*,) contemplated in the Code, Art. 918, to be a judicial separation. No authority to the contrary has been cited for the defendant, and we are not aware of any. If, on the contrary, he did in fact leave collateral relations, of which we have no evidence, still she would have an interest in the preservation and due administration of the estate, having a right in due season to present for adjudication her claims for the marital portion.

Besides, we are not prepared to say that a Judge, in whose Court the *mortuaria* are pending, may not *proprio motu* entertain an inquiry into an abuse of the forms of legal proceedings in his own Court, such as is here presented.

GATES
v.
WALKER.

There was another proceeding in the matter of this succession, which resulted in a separate judgment, from which, also, the defendant has appealed.

It was a judgment, on rule, dismissing the curator from office, and condemning him to pay twenty per cent. interest on $909 40, from August 8th, 1851, until paid.

We are of opinion there is no error in the judgment. The penalty is prescribed by the act of 1837, p. 95. The facts of this case bring it within the statute. The curator, as we have said, is to be considered as having received a cash amount of (at least) $909 40, from *Leefe*, on the 29th July, 1851. He did not deposit in Bank. He has shown no payment of this money to any creditor, except a sum of $693 12 to *Marks*, on the 15th October, 1851, which payment was collusive and void. It is asserted by counsel that the other creditors, among whom, by the tableau, it was proposed to distribute the fund, have been paid; but there is no proof of it. So, that whatever equity there might perhaps be to exempt a curator from the penalty, from the time he actually used money to pay a just debt, there is no proof to let in its application in the present case.

The two judgments are affirmed.

It is, therefore, ordered, adjudged and decreed that the judgment of the Court below, on the trial of the rule of the 8th of June, 1852, be affirmed, with costs. It is further ordered and decreed that the judgment of the Court below on the application of *Widow Almira Gates*, for nullity of judgment, be affirmed, with costs.

Re-hearing refused.